OPINION OF THE COURT
Martin B. Stecher, J.
This is a petition made by June Rosner “for instructions and directions of the Court as to the status of petitioner and respondents as Trustees and as to petitioner’s duty to seek an accounting” and for other and collateral relief, including the removal of respondents as trustees. The respondents cross-move for summary judgment dismissing the petition (CPLR 404, subd [a]; 3212, subd [b]) on the grounds that *593 all of the claims set forth in the petition have been settled, discharged and released.
By memorandum decision dated December 13, 1979, I directed the joinder of the remaindermen, the children of income beneficiaries, petitioner and respondent Mildred Rosner, respectively. Income beneficiaries and remaindermen having a conflict of interest as a matter of law, no representation was possible. I declined to join the children of the remaindermen, as those interests were adequately represented by their parents (CPLR 7703, subd [b]). Joinder has been effected and the remaindermen, all of whom are of age, have now appeared in this proceeding. I also denied respondents’ cross motion to dismiss the petition.
A petition for “instructions and directions” partakes of the nature of an action for a declaratory judgment in which the rights and obligations of the parties are set forth (Lynch v Bailey, 279 App Div 650, affd 304 NY 669). Just as it is inappropriate except in the unusual case, to dismiss an action for a declaratory judgment (see Lanza v Wagner, 11 NY2d 317, opp dsmd 371 US 74), it would appear equally inappropriate to dismiss the petition of a purported trustee for instructions and directions concerning the status of the parties as trustees where a real dispute exists. A real dispute does exist.
On June 1, 1947, Anna and Leo Rosner, as settlors, created in one instrument three separate trusts, one for the benefit of Anna and one for each of the settlors’ two daughters, petitioner June and respondent Mildred, respectively. Leo was sole trustee and the income beneficiaries of the three funds were Anna, Mildred and June respectively. The term of each trust was to be measured by the lives of both Mildred and June. The issue of Mildred and June were to be the remaindermen.
As indicated above, Leo was the sole trustee. The indenture provided, however, that on Leo’s death, resignation or other failure or refusal to serve, Jacob Fisher and Samuel Ecker would be substituted as trustees in Leo’s place; and upon Ecker’s death, failure to qualify, or refusal to serve, Frances Ecker was to serve in Samuel’s place. On the resignation, death, etc., of the surviving Ecker or of Fisher, the *594 other was to serve as sole trustee. There was no provision in the trust for the further designation of trustees and the trust was, by its terms, declared irrevocable.
On May 29, 1951, Leo, Anna, June and Mildred entered into an agreement purportedly modifying the trust. At the same time, Fisher and both Eckers renounced their rights to be trustees. Leo, Mildred, June and Anna agreed in writing: (1) to the appointment of Jacob Fisher, Philip Robbins and Manufacturers Trust Company as successor trustees should Leo die, resign, be incapacitated or otherwise refuse or be unable to serve; and (2) granted to Leo the right to make “any other substitutions or changes in the naming of substitute trustees during the life of Leo Rosner” without requiring the acquiescence or consent of Anna, Mildred or June.
It is undisputed that on May 29,1951, the date of the execution of this agreement, June was under the age of 21 and Mildred had a two-year old daughter, Stacey, the then sole remainderman. (Although under 21 years of age, June apparently was married at the time of the execution of this agreement having signed the agreement as June Wachtel.) It is based on these interests of minors (EPTL 7-1.9) that petitioner attacks the 1951 agreement.
By document dated November 12, 1963, Leo Rosner resigned as trustee, removed all of the substitute trustees and appointed as trustees in his place his wife Anna and his daughter Mildred. It appears that his failure to appoint June resulted, at least in part, from his dissatisfaction with June’s personal life. June had been married to a Dr. Wachtel (apparently with the family’s approval )and had three children with him. She divorced Dr. Wachtel and was about to marry a Mr. Cleanthes, a person of a different faith and nationality who was 20 years June’s senior and the father of four children by a prior marriage. One week later June married Cleanthes.
On December 16, 1963, by written agreement with her father, June “renounced” any interest in the trusts and accepted in its place the shares and proprietary lease of a cooperative apartment at 17 East 84th Street. (Respondents estimate this to have been then worth $150,000. It is a seven- *595 room apartment in one of the most desirable areas of Manhattan.) On the same day, Leo, Anna, Mildred and June entered into an agreement revoking June’s trust, recognizing Anna and Mildred as successor trustees, releasing all trustees for all acts to that date and ratifying each such act.
On February 10,1966, Leo, the father and settlor, apparently relented to some extent and he and his wife and two daughters entered into an agreement which recited the modification of May 29, 1951; rescinded the agreement of December 16, 1963; had June “renounce” all of her rights under the 1947 trust effective December 16,1963; and, effective December 16, 1963, divided what had been June’s trust interest into separate trust interests for June’s three children, all of whom were minors.[1]
On March 27,1973, Leo and Anna as “grantors,” Mildred and Anna as “successor co-trustees” and June as “beneficiary” again entered into an agreement, this time “rescinding” the agreement of December 16,1963 and February 10, 1966 and reinstating June as a beneficiary of the trust. (By this time, June apparently was divorced from Cleanthes having resumed the name June Rosner.)
On August 20, 1977, Leo died.
In 1978, June had prepared, but apparently did not serve, a petition challenging the administration of the trusts. That petition challenged the trustees both as to authority and as to management. She was given access to certain books and records of the trusts which were examined by her accountant who apparently found them to be deficient. Nonetheless, and acting with the advice of two law firms, June, on November 1, 1978, entered into written agreements with her mother, her sister, her sister’s husband Alvin Caplow and with CenPar Operating Corp.,[2] pursuant to which June agreed “not to institute the proposed proceeding against the trustees, the *596 Estate of Leo Rosner and Alvin [Caplow], and agrees to and hereby does waive, remand and release all of her rights to a judicial accounting” subject to certain rights not here relevant. June also “waive [d] and release [d] all claims, demands, actions and causes of action, accounts and reckonings ... on every matter and account whatsoever arising out of [the respondents’] management and administration of the Trusts and Hotel”.
In return June was “hereby * * * designated as a third Trustee of the Trusts” to act with her mother and sister and provision was made for “an appropriate instrument modifying the Trust agreement” to accomplish this designation of a third trustee. Substantial sums of money were paid to June; her mother agreed to make and keep in force a will appointing June to one half the residue of a testamentary trust created by Leo’s will; and June was “appointed * * * to participate in the operation of the Hotel” at $18,000 per annum without obligation to provide services. -
The effective date of the release of June’s right to a judicial accounting was December 1,1978. Less than six months later, June instituted this action seeking, among other relief, an accounting by her mother and sister, their removal as trustees and designating June the “Successor Trustee or Co-Trustee”.
In their papers and memoranda, the remaindermen, in general, support the positions taken by their respective mothers. The Wachtel children reiterate their mother’s charges against their aunt and grandmother; seek, conditionally, their aunt’s and grandmother’s removal as trustees and the appointment of their mother (and perhaps themselves) to that office; and demand of their aunt and grandmother an accounting. The Caplow children seek the removal of the petitioner as a trustee and waive their right to an accounting. Additionally, and significantly, Stacey Cap-low ratifies the 1951 agreement.
In their answer to the Wachtel remaindermen’s cross petition the respondents trustees also assert against the petitioner an affirmative defense and a counterclaim. The affirmative defense asserts that these respondents accounted to the petitioner in 1978 and that the accounting was accepted *597 and settled among them. By way of counterclaim it is alleged, in considerable detail, that the petitioner, a putative trustee since 1978, by refusing to join in various acts required for investment of the trust, has caused the trust damage “in excess of $500,000”. In her reply the petitioner denies the material allegations of this counterclaim.
We turn to the first of the controversial documents, the agreement dated May 29, 1951, which granted to Leo Rosner, one of the two settlors, the right to make subsequent “substitutions or changes in the naming of substitute trustees during the life of Leo Rosner” without the concurrence of anyone else. As previously noted, the petitioner, a party to this agreement, was under the age of 21 years as was the sole remainderman then in being, Stacey Caplow, aged two. It was pursuant to the powers created by the 1951 agreement that Leo Rosner, on resigning as sole trustee in 1963, appointed the respondents as trustees in his place and it is the enforceability of this agreement which will determine the respondents’ de jure status as trustees since 1963.
The law, as it existed in 1947 when the trust was created and in 1951 when it was amended (Real Property Law, former § 118; Personal Property Law, former § 23), is substantially as it is today (EPTL 7-1.9); the “creator” of a trust may revoke or amend it upon the consent of all persons beneficially interested. That the indenture makes the trust “irrevocable” is no impediment to revocation or amendment provided the statutory conditions are observed (Matter of Warren v Cropsey, 29 AD2d 290). Both settlors (the “creator [s]”) were required to concur in the amendment (Culver v Title Guar. & Trust Co., 296 NY 74) and the consents of all three life beneficiaries were required as they were persons “beneficially interested”.
The remaindermen of Mildred Rosner’s trust were her “issue” (“per stirpes and not per capita”) surviving her; and in the absence of issue the corpus of her trust would be divided between and added to the trusts for June and Anna, respectively, or added to the trust of the survivor of June and Anna. An identical provision was made for the distribution of June’s trust, Mildred’s trust being the spill-over beneficiary if June predeceased her without issue surviving. *598 If Anna predeceased her daughters, the corpus of Anna’s trust was to be divided between June’s and Mildred’s trusts. As noted above, June had no issue in 1951 and Mildred’s only issue was two-year-old Stacey. Thus, in 1951, Stacey was the only member of the class of remaindermen.
For the purposes of the statute, unborn issue of the income beneficiaries were not “persons beneficially interested” in the estate (Smith v Title Guar. & Trust Co., 287 NY 500) in 1951 when the modification was executed. Stacey Caplow, the only remainderman then in being was the only remainderman beneficially interested (Matter of Dodge, 25 NY2d 273).
Mildred and Anna, life beneficiaries, duly consented to the modification. June, although a married woman, was still a minor and gave what purported to be her consent. Stacey, of course, did not consent. Had a proceeding been brought shortly after the execution of the 1951 amendment to determine its validity there is no doubt that it would have been declared unenforceable for lack of consent by June and Stacey, persons beneficially interested (Matter of Dodge, supra, p 285). No such proceeding was instituted, however (until 1979), and June, after attaining her majority ratified the amendment in every subsequent agreement recited above. Thus, on grounds of both waiver and estoppel her right to attack the validity of the 1951 amendment on grounds of her own infancy has long been yielded. “Where the cestui que trust has assented to or concurred in the breach of trust, or has subsequently acquiesced in it, he cannot afterwards proceed against those who would otherwise be liable therefor” (Vohmann v Michel, 185 NY 420, 426).
On the same reasoning and authority, June may not challenge the 1951 amendment by reason of Stacey’s then minority. June was always aware of the fact of her niece’s nonage, even if she was not aware of its legal implications. Nonetheless, she ratified the 1951 amendment and accepted benefits under it as recently as 1978, to the apparent detriment of respondent Anna Rosner. June is estopped now to deny its validity by reason of Stacey’s minority nearly 30 years ago.
A question may be raised as to whether June’s children, *599 the Wachtel remaindermen, may attack the 1951 agreement. They, of course, have neither waived such right nor are they, by their conduct, estopped to raise it. This interesting question of their standing to object to a modification which occurred before any of them was born need not be addressed in view of the conclusions hereafter reached.
What we really deal with here is the nature of infancy; whether the failure to obtain an infant’s consent makes an agreement or other jurai act void or merely voidable. For the purpose of the statutes with which we deal (Real Property Law, former § 118; Personal Property Law, former § 23; EPTL 7-1.9) there is no difference between a consent given by an infant and an infant’s failure to consent. In each case there has been a failure to obtain the consent of a person beneficially interested in the trust. Whether June had signed the 1951 agreement or not is irrelevant. What is significant is what she did after attaining her majority. She was as able to give her consent after attaining 21 as she was able to ratify a “consent” given as a minor.
This conclusion is consistent with the laws of infancy generally. Thus, a minor’s contract is not void, although it may be disaffirmed (General Obligations Law, § 3-101; Sternlied v Normandie Nat. Sec. Corp., 263 NY 245; International Textbook Co. v. Connelly, 206 NY 188). A business agreement made by a minor which is both reasonable and provident will be sustained despite the infancy of a party or even his attempted disaffirmance (General Obligations Law, § 3-101, formerly Debtor and Creditor Law, § 260). An infant is and was able to grant consent to surgery and was held unable to revoke that consent after surgery (Bach v Long Is. Jewish Hosp., 49 Misc 2d 207). And, in 1951 an infant over the age of 18 could dispose of real and personal property by will (Decedent Estate Law, § 15, now EPTL 3-1.1).
As indicated above, June’s ratification of her 1951 “consent” given as a minor in no way differed from giving her consent after attaining her majority. This reasoning is as applicable to Stacey’s infancy as it was to June’s. Stacey has consented to the 1951 amendment in her answer and cross petition, and the consent is in the form required by the stat *600 ute (EPTL 7-1.9). The passage of time is not an impediment for there has been no occasion for a court to consider the issue previously. To draw such a conclusion, that Stacey may now give the consent which was lacking and impossible in 1951, is not inconsistent with the purpose of the statutory requirement that each person in being having a beneficial interest give consent as a condition precedent to the amendment of a trust. A beneficial interest in a trust is a vested property right (Whittemore v Equitable Trust Co. of N. Y., 250 NY 298) which cannot be revoked except in accordance with law or upon the holder’s consent. The requirement of consent was intended to protect each interested party’s property right. The right was and is personal to the cestui que trust who is asked to provide it. It is the person whose property right is involved who may grant or withhold the consent. No other person has an interest to invoke the absence of the infant’s consent except, perhaps, to forestall the future commission of an illegal act. Just as an infant’s contract may be ratified ab initia on attaining majority, so an infant’s consent may relate back to the time of the act for which the consent is given.
The Wachtel remaindermen inform me that they do not consent to the 1951 amendment. As previously observed, their consent was never required and the withholding of their consent can have no effect on the validity of the amendment.
I am of the opinion, therefore, that the 1951 trust amendment has been consented to by all people who then had a beneficial interest in the trusts; that Leo Rosner was thereby granted the power to appoint successor trustees; that on his resignation as a trustee in 1963 he was authorized to appoint his successor or successors; that he appointed Anna Rosner and Mildred Caplow; and that they have been authorized to act as such since 1963.
We turn then to the position of June Rosner. Did the 1978 agreement constitute her a trustee? In my opinion it did not, for Anna Rosner and Mildred Caplow were without authority to designate additional or successor trustees.
The designation of an additional or successor trustee is a modification of a trust, unless the power to make such desig *601 nation is contained within the instrument. No such power is reserved in the 1947 indenture and the modification of 1951 granted the right only to Leo Rosner and “during the life of Leo Rosner”. Obviously, the power granted in 1951 died with Leo Rosner in 1977.
The statutory power to amend the trust (EPTL 7-1.9) also died with Leo Rosner; for there can be no amendment of a trust except by all settlors. "On the death of one of any number of settlors, no further change is possible (Culver v Title Guar. & Trust Co., 296 NY 74, supra); and the trust becomes “indestructible” (Ridge v Felt, 267 App Div 777). Thus, the consents of all the remaindermen to the 1978 “modification” appointing June a trustee are ineffective. By 1977 the trust had become “indestructible” and was beyond amendment.
June Rosner has asked the court to determine the validity of her “appointment as co-trustee”. The answer is that her so-called appointment was a nullity.
The parties, following submission of the supplemental petition, have argued the effect of the agreements made in 1963,1966 and 1973 in which June, her parents and her sister purportedly first agreed to revocation of June’s life interest, then to the substitution of June’s children in June’s place and, finally, to the restoration of June in place of her children to the position of income beneficiary. An examination of the papers, however, reveals no request for relief directed toward these interests by June or her children or anyone else. Under such circumstances I must decline to address the problem.
Both the petitioner and her children petition the court to compel the trustees to account. June Rosner’s petition, to the extent it deals with the period up to and including December 1, 1978, is denied. She has expressly, for a substantial consideration, waived her right to an accounting in the 1978 settlement agreement. No issue is raised by the parties as to the effect on the 1978 agreement or any of its parts of the determination now made that June’s appointment as a trustee was a nullity, and I, therefore, decline to deal with that problem. On the state of this record, June Rosner is not entitled to an accounting.
*602 Her children, however, are entitled to an accounting. They are, at the least, vested-remaindermen of the trust established for June Rosner’s benefit and contingent remaindermen of the other two trusts. They may be both life beneficiaries and remaindermen. They are, accordingly, entitled to an accounting, particularly as no formal account has ever been rendered or judicially settled. Accordingly, within 120 days after a copy of the order to be entered herein is served with notice of entry, the respondents shall account for the period November 12, 1963 through December 31, 1979 concerning their stewardship of all three trusts and shall petition for settlement of the accounts.
The application to remove the trustees and appoint different or additional trustees is denied pending the accounting and the petition to settle the accounts at which time leave to renew is granted. All other applications not expressly dealt with herein are denied.

. June’s children are Jeffrey Wachtel, born March 12, 1953; Wendy Wachtel, born February 12, 1956; and Marcy Wachtel, born October 9, 1957. While we have not been given the exact birth dates of the Caplow children, Stacey, a member of the Bar, is 31 years old and Amy, her sister, is 22 years old.

. Cen-Par Operating Corp. operated the Century-Paramount Hotel. The trusts had a two-thirds interest in the hotel, Leo’s estate owning the balance. Cen-Par’s stock was owned in equal shares by Anna, Mildred, June, Alvin Cap-low and Leo’s estate.